J-A15025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ROBERT EMANUEL JACKSON, JR. | |
| Appellant | No. 1027 MDA 2016 |

Appeal from the Judgment of Sentence dated March 29, 2016
In the Court of Common Pleas of Cumberland County
Criminal Division at No(s): CP-21-CR-0003688-2014

BEFORE: MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY SOLANO, J.:                **FILED NOVEMBER 02, 2017**

Appellant, Robert Emanuel Jackson, Jr., appeals from the judgment of sentence imposed after he was convicted by a jury of rape, aggravated assault, and related offenses.[1]  We affirm.

We state the facts in the light most favorable to the Commonwealth, as verdict-winner.  ***See Commonwealth v. McFadden***, 156 A.3d 299, 303 (Pa. Super. 2017).  As the trial court explained, in December 2013, the

---

[1] Specifically, Appellant was convicted of rape by threat of forcible compulsion, 18 Pa.C.S. § 3121(a)(2); involuntary deviant sexual intercourse by threat of forcible compulsion, ***id.*** § 3123(a)(2); burglary of a building adapted for overnight accommodations while a person is present, ***id.*** § 3502(a)(1); sexual assault, ***id.*** § 3124.1; aggravated assault, ***id.*** § 2702(a)(4); possession of a firearm by a person prohibited from possession, ***id.*** § 6105(a)(1); criminal trespass by entry of a building or occupied structure, ***id.*** § 3503(a)(1)(i); unlawful restraint creating a risk of serious bodily injury, ***id.*** § 2902(a)(1); terroristic threats with intent to terrorize another, ***id.*** § 2706(a)(1); and simple assault, ***id.*** § 2701(a)(3).

victim, Jennifer Woodard, began a romantic relationship with Appellant. Trial Ct. Op. at 2; N.T. Trial at 60-61.  Then —

> In September 2014, she unilaterally ended the relationship. Despite the end of the relationship, [Appellant] would not stop contacting the victim by phone and social media[,] forcing her to block him electronically on all platforms.  All this notwithstanding, on October 21, [2014, Appellant] showed up at [Ms. Woodard]'s house unannounced and uninvited, pushed his way in and pressured [Ms. Woodard] into a discussion about their relationship.  Ultimately, she convinced him to leave, which he did without harming her, though he was extremely angry she had not permitted him to stay overnight.

Trial Ct. Op. at 2; *see also* N.T. Trial at 63.

On October 31, 2014, Ms. Woodard was alone in her home getting ready to go out with friends.  Trial Ct. Op. at 2; *see also* N.T. Trial at 64-65. Appellant knocked on her door, and, when she answered it, he pulled a gun on her, pressed it against her head, and forced his way inside.  "With the gun held to her head, he said, 'I'm going to kill you, bitch, and I'm going to kill myself.'"  Trial Ct. Op. at 2 (quoting N.T. Trial at 66).  Appellant "hit [Ms. Woodard] across the face, and [she] fell down."  N.T. Trial at 66. Ms. Woodard later testified that Appellant hit her with "[h]is hand . . . [o]n the left side of [her] face" "several times"; she added:  "I don't know if he punched me [or] hit me with an open hand."  *Id.*  When asked if Appellant "hit you hard," Ms. Woodard answered affirmatively.  *Id.* at 92.

Appellant "then grabbed [Ms. Woodard] by her hair and pulled her across the floor into her bedroom while she begged for her life."  Trial Ct. Op. at 2; *see also* N.T. Trial at 66-67.  He closed the door and pointed the

gun at her. Trial Ct. Op. at 2. The trial court then described Appellant's assault:

> As he forced [Ms. Woodard] to take her clothes off, he taunted her by tracing the point from the laser scope of the gun over various parts of her body. He demanded she perform oral sex on him and threatened that if she failed to comply her children would never see her again. During these threats, [Appellant] removed the jacket he was wearing but kept his clothes on while he had his penis out and was masturbating. [Appellant] began counting out loud[,] threatening that if [Ms. Woodard] did not comply with his demands by the time he reached 10 he would kill her. In fear for her life and against her will, [Ms. Woodard] complied, and performed oral sex on [Appellant]. During the entire time she was being forced to have [Appellant]'s penis in her mouth, he had the gun pressed against her head.
>
> After a period of time, [Appellant] forced [Ms. Woodard] onto her bed and penetrated her vaginally. He was not wearing a condom and ejaculated almost immediately. He then attempted to penetrate her anally but, in pain, she screamed and jumped away. At that moment, [Appellant]'s demeanor suddenly changed. With seeming remorse, he said he couldn't believe he hit her and raped [her] and that he could not go to jail. Still in fear for her life, as [Appellant] remained armed, [Ms. Woodard] told him that she would never tell anyone what happened and tried to convince him to consider his love for his children and just to leave peacefully.

*Id.* at 2-3; *see also* N.T. Trial at 67, 70.

In an apparent attempt to explain his actions and state of mind, Appellant then forced Ms. Woodard to read aloud entries from a personal journal that were stored on his cellular telephone. Cmwlth. Ex. 20, Attachment #2; N.T. Trial at 70-74. In the journal, Appellant wrote:

> My feelings all over the place. I have been talking to my friend, the one who have been listening. Sometimes I feel she hears what she wants to hear and not what I'm saying. Sometimes I don't even know what I'm saying.

I miss my son.  He's 15 and I haven't seen him since he was 6. His mother and I never got along. I married her because she was pregnant.  I thought I loved her but never did. . . . I never knew there were so much raw emotions inside me.  Never knew the level of my hurt until now. . . . I want to badly share this with Jennifer but I know she doesn't care one bit about me. . . . The anger is fading; my focus and future seem bright. . . . For so long, too long I have been hurting.  For nothing but the love of God can ease my pain.  I became numb to this pain, never knowing it was killing me slowly only surfacing to cause damage to those around me, to those I love.

My hurtful words were, are a result of that pain. . . . I caused pain that no apologies can heal. . . . Many thoughts flooding my mind, a lot of what ifs, could've been.  If this keeps up its going to be a long day. . . . Reached out to three Therapists this morning that accepts my insurance. . . . First appointment is Friday October 31, 2014.  To be honest, I'm a little bit nervous. No correction, I'm scared to death! . . . Its 3:00 and I can only imagine the smile on her face because she just got off. . . . Here I go again, thinking about her. . . . Now the drive home with nothing but my thoughts. . . . To say I wasn't thinking about Jennifer would be a lie. . . . Really don't want to be here.  Sitting here thinking. . . . Do I really want that? . . . Only in my mind have I spoken with her. . . . I've been talking to a great friend about my feelings these last few days. . . . While talking to my friend I must have called Jennifer the "b" word a hundred times. I have never called her out of her name before so I don't know why I am so angry. . . . I don't know but something is causing my anger towards her and I can't fully explain it. . . . Really not in the mood to write, talk or whatever it is I'm doing here. Starting to wonder what the purpose is anyway. . . . These feelings.  Where the hell are they coming from?  Why do I feel the way I do?  No damn wonder I am 48 and alone. . . . I'm sitting at work and really didn't feel like coming in but I'm glad I am here.  I don't know if I could stand the random thoughts that flood my mind if I had nothing to focus on all day.  I've been there before the pain, damn to say the least.  Not a good feeling. . . . I think I smiled a little.  Haven't really thought about Jennifer too much.  Don't know if that's good or bad. . . . Thinking about Jennifer again.  Wondering if she misses me, is her heart aching like mine? . . . So embarrassing to say the least. . . . The thoughts, images and unknown are consuming me.  She is all I think about.  I want bad to contact her but I know she wouldn't take my calls, answer my text or email. . . .

But to be honest, I'm scared of the things she will pull out of my head. . . . Was she afraid of what was in her head, was it too much?

I'm feeling anxious!  Man, I hate this feeling....

Cmwlth.  Ex. 20, Attachment #2, at 1-4.  The journal also included what the trial court described as "an entry written just before the assault occurred addressed to [Ms. Woodard] describing how [Appellant] missed [her] and wanted to get back together with her"; the court added that this passage had an "ominous ending."  Trial Ct. Op. at 7; **see also** Cmwlth. Ex. 20, Attachment #2, at 1.  The entry reads:

Dear Jennifer,

Words cannot describe how much you mean to me.  When I look at our pictures I smile, cry and laugh all at once.  I will forever be grateful of the time we spent together.  You were that once great love I let get away.  For that, I'm the fool.

Remember Me,

Robert

Journal complete, outcome UNKNOWN

**Id.** (capitalization in original).

The trial court continued:

After [Ms. Woodard] finished reading the journal entries[, Appellant] professed his love for her repeatedly and then left. As a result of the attack, [Ms. Woodard] suffered facial bruising and fear for her life and safety and the safety of her children.

In extreme distress and afraid [Appellant] may return, [Ms. Woodard]'s first concern was for her two children who were out with friends.  She left to pick up her children . . . On the ride over, she called 911.

- 5 -

Trial Ct. Op. at 3-4; *see also* N.T. Trial at 70-75. Ms. Woodard had a rape kit examination performed by a nurse at Harrisburg Hospital, and the DNA analysis from it "resulted in a match for Appellant's semen." Trial Ct. Op. at 4; *see also* N.T. Trial at 78, 148, 293-94. A medical examination also noted that Ms. Woodard's face was bruised and she had blood in her nasal passage. Trial Ct. Op. at 3.

Police found Appellant's coat in Ms. Woodard's residence. Trial Ct. Op. at 4; *see also* N.T. Trial at 78-79. In a search of Appellant's residence, they found a loaded gun with a laser sight that Ms. Woodard later identified as the gun used during Appellant's assault. *Id.* at 85, 208-10. They also found an iPad that contained a document titled "Diary of a Broken Man"; it made several references to Ms. Woodard and contained passages that Ms. Woodard identified as matching those from the journal that Appellant forced her to read on the night of the assault. *Id.* at 70, 210-11, 262.

At 6:43 P.M. on November 1, 2014, under the supervision of police, Ms. Woodard made a recorded phone call to Appellant in which she confronted him about the attack. Appellant said he was driving to North Carolina, ended the call because of poor cell phone reception, and then called Ms. Woodard back. Appellant's return call also was recorded by the police. Trial Ct. Op. at 4; *see also* Cmwlth. Ex. 10 (recording of call). During the calls, Appellant did not admit assaulting Ms. Woodard but said he did not plan to hurt her and would be sending her a letter.

Ultimately, Appellant was arrested and charged with numerous offenses. Prior to his trial, he moved to exclude the iPad document (which was referred to during a pretrial hearing on his motion as Appellant's "diary") and the November 1, 2014 recorded calls on the ground that they included inadmissible hearsay. The trial court denied those motions. It found that the calls were "not hearsay" and "not more prejudicial than probative." N.T. Trial at 14-15.[2] Similarly, it found that "the contents of the diary are not hearsay and are relevant to the elements of various offenses." *Id.* at 15.

Appellant was tried before a jury on December 14-17, 2015. During the trial, Ms. Woodard provided a chronology of events, as well as graphic and detailed testimony about the Appellant's crimes. N.T. Trial at 60-75, 78. In the midst of her testimony, the two recorded phone calls were played for the jury. *See id.* at 86. Officer Jason Reed of the East Pennsboro Township Police Department testified that when he went to Ms. Woodard's home the day after the assault, he found a coat on the floor that Ms. Woodard reported belonged to Appellant. *Id.* at 124, 128. Detective Shane Cohick of the East Pennsboro Township Police Department testified that a search of Appellant's bedroom at his West Virginia residence recovered a black metal box that contained a .40 caliber Glock pistol that was loaded with a full magazine, including a bullet inside the barrel, with a laser sight. *Id.* at 202,

---

[2] The hearing immediately preceded the trial, and it was transcribed as part of the trial transcript.

205-08, 210. The jury heard testimony from a representative of AT&T Wireless, the service provider for Appellant's cellular telephone, that cell phone tower location records for Appellant's phone corroborated Ms. Woodard's timeline of events and confirmed Appellant's presence in the vicinity of Ms. Woodard's home at the time of the attack. *Id.* at 246, 252-55; Trial Ct. Op. at 4. Special Agent Matthew Zahm of the computer forensics unit of the Pennsylvania Office of Attorney General testified that he had found a document entitled "Diary of a Broken Man" on Appellant's iPad, and he related some of its contents; later, in response to a request from the jury, the jury was given a copy of that document for its review in the jury room. N.T. Trial at 260, 262, 373-74. Forensic DNA scientist Brittni Andaloro testified that Appellant's DNA was present inside Ms. Woodard's vagina. N.T. Trial at 286, 293-94; Trial Ct. Op. at 4.

On December 17, 2015, the jury convicted Appellant of the above offenses. Appellant then was sentenced to an aggregate sentence of 20.5 to 43 years in a State Correctional Facility. Trial Ct. Op. at 4-5. At the time of sentencing, the trial court stated that "a lesser sentence would depreciate the seriousness of the crimes involved." N.T. Sentencing at 7.

On April 8, 2016, Appellant filed post-sentence motions for modification of sentence and for a new trial on the basis that the verdict was against the weight of the evidence. The post-sentence motion did not challenge the sufficiency of the evidence. On May 24, 2016, the trial court denied Appellant's post-sentence motions.

On June 23, 2016, Appellant filed a notice of appeal. Appellant raises

four issues for our review:

> I.    Did the trial court abuse its discretion when it denied Appellant's pre-trial motion to exclude a consensualized phone call and Appellant's journal from the Commonwealth's case in chief?
>
> II.    Whether the evidence was insufficient to prove beyond a reasonable doubt that Appellant is guilty of aggravated assault with a deadly weapon where Appellant's conduct never caused any bodily injury with the deadly weapon?
>
> III.    Did the trial court err in denying Appellant's motion for a new trial when the jury's verdict was against the weight of the evidence because the Commonwealth failed to meet its burden to sustain the alleged charges?
>
> IV.    Did the trial court abuse its discretion when it imposed consecutive sentences where Appellant's conduct was not so egregious to warrant a twenty[] and one-half to forty-three (2[0].5-43) year sentence?[3]

Appellant's Brief at 10 (reordered to facilitate disposition, and suggested

answers omitted).

## Admission of Evidence

The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse only upon a showing that the trial court clearly abused its discretion.

> Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact. Once evidence is found to be relevant, it will be inadmissible only if its

---

[3] Appellant repeatedly states incorrectly in his brief that he was sentenced to 21.5-40 years. Appellant's Brief at 10, 23-24.

probative value is substantially outweighed by the danger of unfair prejudice or confusion.

Unfair prejudice is a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

**McFadden**, 156 A.3d at 309 (citations and quotation marks omitted).

*Recorded Telephone Calls*

Appellant argues:

The trial court abused its discretion when it denied Appellant's pre-trial motion to exclude . . . consensualized phone call[s] . . . from the Commonwealth's case in chief . . . under theories of hearsay and that the evidence was more prejudicial than probative. . . . [N]othing in [the recorded calls] would amount to an admission that would warrant admission under the current rule of evidence.

Appellant's Brief at 33. The Commonwealth answers that "the trial court properly admitted the recording of the consensual phone conversation . . . because [it] qualif[ies] as admissible hearsay under the Rules of Evidence." Commonwealth's Brief at 25; **see also id.** at 27. The Commonwealth continues that, when Appellant's "statement is considered in the context of Ms. Woodard confronting [Appellant] about the attack that occurred the previous night, it is clear that it qualifies as an admission by an opposing party and is admissible under Rule 803(25)(A)." **Id.** In holding that the recordings were admissible, the trial court agreed with the Commonwealth:

During the taped conversation, [Appellant] made numerous statements that can be characterized as admissions. . . . [Appellant's] comments, considered in the context of the victim confronting [Appellant] the day after his brutal attack upon her[,] constitute sufficient admissions to permit them to be

- 10 -

offered against [Appellant]. This [trial] court did not err in admitting the recording of the telephone call.

Trial Ct. Op. at 6.

Although, generally, "[a]ll relevant evidence is admissible," Pa.R.E. 402, hearsay evidence, even if relevant, is usually not admissible. Pa.R.E. 802. "'Hearsay' means a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). However, an opposing party's admission is not excluded under the hearsay rule. Rule of Evidence 803(25)(A) states:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . .
>
> **An Opposing Party's Statement.** The statement is offered against an opposing party and:
>
> (A) was made by the party in an individual or representative capacity . . . .

Pa.R.E. 803(25)(A). We have explained this exception as follows:

> Party admissions are not subject to hearsay exclusion because it is fair in an adversary system that a party's prior statements be used against him if they are inconsistent with his position at trial. In addition, a party can hardly complain of his inability to cross-examine himself. A party can put himself on the stand and explain or contradict his former statements. Thus, in criminal cases, th[e Supreme Court of Pennsylvania] has consistently held that a defendant's out-of-court statements are party admissions and are exceptions to the hearsay rule.

*Commonwealth v. Edwards*, 903 A.2d 1139, 1157-58 (Pa. 2006) (citations omitted; some formatting added), *cert. denied*, 549 U.S. 1344

- 11 -

(2007).

Appellant's arguments in opposing admissibility of this evidence (and, to some extent, the responses by the Commonwealth) are based on a misunderstanding of Rule 803(25)'s hearsay exception for statements by an opposing party. To be admissible, the statement does not need to be a confession to the crime. *Commonwealth v. Simmons*, 662 A.2d 621, 635 (Pa. 1995), *cert. denied*, 516 U.S. 1128 (1996). Indeed, it need not even be contrary to the declarant's interest. As we observed in *Commonwealth v. Hoyman*, 561 A.2d 756, 761 (Pa. Super. 1989), "declarations against interest and admissions are at times misunderstood by lawyers. A declaration against interest must have been against the declarant's interest when made. No such requirement exists with respect to admissions."[4] To dispel the confusion, the drafters of the Rules of Evidence removed the common term "admission" when describing the exception in Rule 803(25), making clear that any "statement" by an opposing party is admissible, not just an "admission." Pa.R.E. 803, Comment. Thus, Pennsylvania decisions frequently admit statements by a criminal defendant that fall far short of an admission of guilt.[5] There is no dispute that the statements made during

_____

[4] Declarations against interest fall under a different Rule of Evidence relating to hearsay exceptions applicable where the declarant is unavailable as a witness. *See* Pa.R.E. 804(b)(3).

[5] *See*, *e.g.*, *Commonwealth v. Paddy*, 800 A.2d 294, 312 & n.11 (Pa. 2002) (defendant's warning that witness was "saying things she shouldn't say" was admissible as a statement by a party opponent); *Commonwealth* *(Footnote Continued Next Page)*

the recorded phone calls at issue here were made by Appellant. Accordingly, they were statements by a party opponent that were admissible on introduction by the Commonwealth under Rule 803(25); they are not inadmissible hearsay.

The trial court held that Appellant's statements during the phone calls not only were admissible exceptions to the hearsay rule but were probative and not unduly prejudicial. We agree. During the first of the November 1, 2014 phone calls, when Ms. Woodard asked for an explanation of Appellant's conduct the night before, Appellant, who expressed a concern that Ms. Woodard might be recording the call, responded, "You're going to get a letter in the mail." Cmwlth. Ex. 10, First Recorded Call, at approx. 5:55; *see id.* at approx. 2:26 (inquiry by Appellant about whether call was being recorded).[6] In response to Ms. Woodard's repeated pleas for an explanation,

---

*(Footnote Continued)*

*v. Smith*, 540 A.2d 246, 257 (Pa. 1988) (defendant's statement asking whether witness had seen decedent was admissible as an opposing party's statement); *Commonwealth v. Tervalon*, 345 A.2d 671, 676 (Pa. 1975) (defendant's statement contradicting wife's statement about his whereabouts on night crime committed admissible as party admission; "extrajudicial statements made by a defendant may be used against that defendant although they contain no admission of guilt").

[6] We have been hampered in our review of this issue by the absence from the certified record of a transcript of the telephone calls. During the pretrial hearing, the Commonwealth stated that it had a transcript of the recorded calls "here somewhere" that it would provide to the trial court. N.T. Trial at 7. But it appears that the transcript never was provided, since the certified record does not include it. The record does, however, contain a compact disc that contains the audio recordings that were played before the jury, *see* Cmwlth. Ex. 10, and we have listened to those recordings in deciding this issue.

- 13 -

Appellant stated that "I don't have the words to help you right now" and "I never planned on hurting you, killing you." *Id.* at approx. 9:34, 11:27. Appellant made similar statements in the second call and, after again expressing concern that he was being recorded, ended the call by stating that he would tell Ms. Woodard what she wanted to know in another call that he would make to her at an unscheduled time the next day. *Id.*, Second Recorded Call, at approx. 0:45, 1:25, 7:25; *see id.* at approx. 4:43 (expressed concern about recording of call).

Although Appellant's statements during these calls were ambiguous, we agree with the trial court that they were probative and admissible. They evidenced an understanding that events had occurred about which Ms. Woodard was seeking an explanation, a desire to disclaim an intent to harm or kill Ms. Woodard, and an intention to provide an explanation at a later time when police might not be listening. In opposing admission of the statements, Appellant argues that they suggest that he had "a less than rational state of mind" and "was questioning his sanity." Appellant's Brief at 34-35. In the context of the facts of this case, we do not view that possibility as so prejudicial to Appellant as to make these statements inadmissible. The appropriate meaning and interpretation to give the statements was a question for the jury, which also was in the best position to decide what weight should be assigned to them. The trial court did not err in admitting the statements.

*Appellant's Journal*

Appellant also contends that the trial court abused its discretion when it denied Appellant's pretrial motion to exclude his journal (or "diary") from the Commonwealth's case in chief. Appellant's Brief at 33. The journal, as described by the trial court, "included an entry written just before the assault occurred" that was addressed to Ms. Woodard and included "an ominous ending: 'Journal complete[, o]utcome [UNKNOWN].'" Trial Ct. Op. at 7; **see also** Cmwlth. Ex. 20, Attachment #2, at 1. Appellant asserts that the journal was written by him before the incident at issue but "contain[s] no plans to rape or injure [Ms.] Woodard." Appellant's Brief at 34-35. He asserts that the admission of the journal was improper "under theories of hearsay and that the evidence was more prejudicial than probative." **Id.** at 35.

The Commonwealth argues that Appellant's "diary was comprised of admissible hearsay as it showed his state of mind directly prior to the attack. . . . [Appellant]'s diary meets the requirements of Rule 803(3) and was properly admitted." Commonwealth's Brief at 27-28. The trial court concluded: "Obsessive diary entries addressed to the victim written hours before she was attached by [Appellant] are clearly relevant to establishing his state of mind and motive on the night of the crime." Trial Ct. Op. at 7.

There is no dispute that the journal was written by Appellant. We therefore conclude that its content was admissible because it contained

statements by a party opponent under Rule 803(25). We also conclude that the journal was admissible under Pa.R.E. 803(3), which states:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> . . . A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Throughout the journal, written in the days and hours immediately preceding his crimes, Appellant wrote about his "feelings," his "emotions," and how he "feel[s]." Cmwlth. Ex. 20, Attachment #2, at 1-2. Specifically, he wrote about Ms. Woodard – what he "wants" from her, that he "know[s] she doesn't care one bit about [him]," and that he is "so angry" with her and feels "anger towards her." *Id.* at 1-2. These statements demonstrate Appellant's "state of mind" and his "emotional . . . condition," both in general and explicitly about Ms. Woodard. Pa.R.E. 803(3). Thus, the journal was not excluded by the rule against hearsay.

Appellant's argument that the journal was unduly prejudicial mirrors his argument regarding his statements during the recorded telephone calls, and we reject it for the same reasons. We therefore hold that the trial court did not abuse its discretion by permitting admission of the journal.

### Sufficiency

Appellant contends that "the evidence was insufficient to prove beyond a reasonable doubt that Appellant committed aggravated assault with a

- 16 -

deadly weapon where the Commonwealth's evidence failed to establish that Appellant caused any bodily injury with a deadly weapon . . . or attempted to cause bodily injury with a deadly weapon[.]" Appellant's Brief at 19-20.

> Our standard of review for a sufficiency of the evidence challenge is well established:
>
>> A claim challenging the sufficiency of the evidence presents a question of law. We must determine whether the evidence is sufficient to prove every element of the crime beyond a reasonable doubt. We must view evidence in the light most favorable to the Commonwealth as the verdict winner, and accept as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder properly could have based its verdict.

*McFadden*, 156 A.3d at 303 (citations omitted).

Appellant argues that Ms. Woodard testified that he "struck" her "with his hand knocking her to the floor, then drug her to the bedroom by her hair." Appellant's Brief at 20 (citing N.T. Trial at 66). Appellant continues that, "[o]n cross examination Ms. Woodard specifically stated that she was punched or struck with an[] open hand three times on the left side of her face knocking her to the floor." *Id.* at 21 (citing N.T. Trial at 92). Appellant maintains that this testimony demonstrates that he "never caused or attempted to cause bodily injury with a deadly weapon." *Id.* at 22. He concludes: "Although Appellant did possess a weapon, it was never used on [Ms.] Woodard. Thus, the Commonwealth has failed to provide sufficient evidence to show that Appellant caused or attempted to cause the requisite bodily injury with a deadly weapon." *Id.*

- 17 -

The Commonwealth insists that "[t]here is sufficient evidence to sustain [Appellant]'s conviction of aggravated assault as the victim suffered injury when [Appellant] forcibly raped her at gunpoint." Commonwealth's Brief at 13. The Commonwealth asserts that Appellant's argument "is without merit as [Appellant] forcibly pressed the gun into the victim's head and face causing injury." *Id.* The Commonwealth states:

> In this case, the evidence clearly supports [Appellant]'s conviction as Ms. Woodard testified that [Appellant] charged into her home with a handgun, shoved the handgun against her head, and proceeded to rape her at gunpoint. . . . Clearly, the jury's finding of guilt is supported by sufficient evidence and [Appellant] must be denied relief.

*Id.* at 14-15.[7]

The trial court stated that "this issue is waived," because Appellant "failed to raise this issue in any way" in his post-sentence motion. Trial Ct. Op. at 10. However, because a challenge to the sufficiency of the evidence may be raised for the first time on appeal, Appellant did not waive this claim, even though he did not include it in his post-sentence motions. *See* Pa.R.Crim.P. 606(A)(7); *Commonwealth v. Wertelet*, 696 A.2d 206, 208 n.2 (Pa. Super. 1997).

The trier of fact is free to believe all, part, or none of the evidence. *Commonwealth v. Melvin*, 103 A.3d 1, 40 (Pa. Super. 2014). Moreover,

---

[7] The Commonwealth adds that Appellant's "sentence on Aggravated Assault is concurrent to sentences on several other charges. Even if this Court were to find that there is insufficient evidence, [Appellant]'s aggregate sentence would not change." Commonwealth's Brief at 15 n.11.

the trier of fact may base a conviction solely on circumstantial evidence. In reviewing the evidence, the appellate court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Id.*

"A person is guilty of aggravated assault if he attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]" 18 Pa.C.S. § 2702(a)(4). Section 2301 of the Crimes Code defines "bodily injury" as "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. Section 2301 likewise defines "deadly weapon" as:

> Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury.

*Id.*

Here, viewing the evidence in a light most favorable to the Commonwealth as the verdict winner, the record establishes that Appellant repeatedly pressed his firearm against Ms. Woodard's head, and she suffered facial bruising. *See McFadden*, 156 A.3d at 303; *see also* Trial Ct. Op. at 3. The jury, as factfinder, properly could have based its verdict on the reasonable inference that Ms. Woodard's facial bruising was caused by Appellant pressing the firearm to her face and head. *See McFadden*, 156 A.3d at 303; *see also* Trial Ct. Op. at 3. We have held that bruising may constitute "bodily injury" as defined in Section 2301. *See In the Interest of M.H.*, 758 A.2d 1249, 1252 (Pa. Super. 2000), *appeal denied*, 766 A.2d

1250 (Pa. 2001). Although the firearm that inflicted this injury was not used in the traditional way, it still meets Section 2301's definition of a "deadly weapon" ("[a]ny firearm, whether loaded or unloaded"). Hence, the evidence was sufficient to prove every element of 18 Pa.C.S. § 2702(a)(4) beyond a reasonable doubt. **See McFadden**, 156 A.3d at 303. Appellant's sufficiency challenge therefore fails.

## Weight of the Evidence

Next, Appellant contends:

> The trial court erred in denying Appellant's motion for a new trial when the jury's guilty verdict was against the weight of the evidence because the Commonwealth failed to meet its burden to sustain the charges of rape, [involuntary deviant sexual intercourse], burglary, sexual assault, aggravated assault, possession of a firearm prohibited, criminal trespass, unlawful restraint, terroristic threats, and simple assault.

Appellant's Brief at 27.

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question [of] whether the verdict is against the weight of the evidence.

**Commonwealth v. Ramtahal**, 33 A.3d 602, 609 (Pa. 2011) (citation omitted).

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses.
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the

findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

In order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court. . . . [A]n appellate court cannot substitute its judgment for that of the finder of fact.

*Commonwealth v. Talbert*, 129 A.3d 536, 545–46 (Pa. Super. 2015)

(internal citations and quotation marks omitted; some formatting added),

*appeal denied*, 138 A.3d 4 (Pa. 2016).

Here, the trial court addressed Appellant's weight of the evidence

challenge as follows:

At the hearing on [Appellant]'s Post-sentence Motion, his counsel argued that the jury's verdict was against the weight of the evidence because even though the alleged attack occurred on Halloween night in a crowded residential neighborhood, a police canvass of the area revealed no witnesses who heard the attack. He also argued that despite [Ms. Woodard]'s account of the attack, there were no visible extreme physical injuries on her body to substantiate her claims.

These allegations are insufficient to shock the court's conscience and compel us to order a new trial. First, whether people who may have been outside of [Ms. Woodard]'s home heard the attack is really not relevant. Next, [Appellant] raped [Ms. Woodard] at gunpoint thereby using the weapon to force her compliance which would help explain the lack of extreme physical injuries. Also, as noted by the nurse's testimony at trial, lack of evidence of physical trauma is not necessarily evidence that a rape did not occur. Finally, [t]here was DNA evidence showing [Appellant] had had intercourse with [Ms. Woodard] and his coat was left at the scene of the crime. Based on these facts and all the evidence introduced at trial the

court is well-satisfied that the jury's verdicts are not against the weight of the evidence.

Trial Ct. Op. at 8. We agree with the trial court's reasoning.

Appellant essentially asks us to reassess Ms. Woodard's credibility and to reweigh the testimony and the evidence presented at trial. Appellant's Brief at 27-32. We cannot and will not do so. *See Talbert*, 129 A.3d at 546. The jury found credible Ms. Woodard's testimony, which was corroborated by other testimony and physical evidence. *See id.* at 545. Thus, the verdict was not so contrary to the evidence as to shock the court's conscience, *see id.*, and we discern no abuse of discretion by the trial court. *See Ramtahal*, 33 A.3d at 609.

## Sentencing

Lastly, Appellant argues:

The trial court erred when it denied Appellant's post-sentence motion for modification of sentence where Appellant's incarceration for twenty[] and a half to forty-three years (2[0].5-43), essentially amounts to a life sentence, and fails to consider the issues of protection of the public, gravity of the offense as it relates to the victim and the community, and the rehabilitative needs of the Appellant as required by 42 Pa.C.S.A. §9721(b).

Appellant's Brief at 23. Appellant also maintains that his sentence is "manifestly excessive such that it constitutes too severe a punishment where Appellant's incarceration for twenty[] and a half to forty-three (2[0].5-43) years[] essentially amounts to a life sentence[.]" *Id.* at 23-24. Additionally, Appellant insists that the "[t]rial court failed to consider the relationship

- 22 -

between the [A]ppellant and [Ms.] Woodard" and that "[Ms.] Woodard suffered no physical injury as a result of the offenses." *Id.* at 25.

The Commonwealth responds that the trial court "did not abuse its discretion" when Appellant's "sentence is within the standard guideline range and when [Appellant] brutally raped the victim at gunpoint." Commonwealth's Brief at 16.

The trial court observed that Appellant's sentence "is a standard range sentence and in light of the horrible violence inflicted on the victim, it was wholly appropriate." Trial Ct. Op. at 9. The trial court reiterated that "a lesser sentence would depreciate the seriousness of the crimes involved." *Id.* It "submits that this standard range sentence is not disproportionate to [Appellant]'s crimes." *Id.*

"A challenge to the discretionary aspects of a sentence is not appealable as of right." *Commonwealth v. Luketic*, 162 A.3d 1149, 1159 (Pa. Super. 2017) (citation and internal brackets omitted). We will exercise our discretion to consider such a petition only if (1) the appellant has filed a timely notice of appeal; (2) he has preserved the sentencing issue at the time of sentencing or in a motion to reconsider and modify his sentence; (3) he presents the issue in a properly framed statement in his brief under Rule 2119(f) of the Rules of Appellate Procedure, pursuant to *Commonwealth v. Tuladziecki*, 522 A.2d 17 (Pa. 1987); and (4) in the words of Section 9781(b) of the Sentencing Code, 42 Pa.C.S. § 9781(b), "it appears that there is a substantial question that the sentence imposed is not appropriate

under this chapter." **See, e.g.**, **Commonwealth v. Haynes**, 125 A.3d 800, 807 (Pa. Super. 2015), **appeal denied**, 140 A.3d 12 (Pa. 2016); **Commonwealth v. Zelinski**, 573 A.2d 569, 574-75 (Pa. Super.), **appeal denied**, 593 A.2d 419 (Pa. 1990). "A defendant presents a substantial question when he sets forth a plausible argument that the sentence violates a provision of the Sentencing Code or is contrary to the fundamental norms of the sentencing process." **Luketic**, 162 A.3d at 1160 (citation omitted).

Here, Appellant filed a timely notice of appeal, preserved his sentencing issue in a post-sentence motion to modify his sentence, and presented the issue in a properly framed statement in his brief pursuant to Pa.R.A.P. 2119(f). **See** Appellant's Brief at 17-18; **see also Tuladziecki**, 522 A.2d 17; **Haynes**, 125 A.3d at 807; **Zelinski**, 573 A.2d at 574-75. Finally, Appellant presents a substantial question by setting forth an argument that his sentence violates 42 Pa.C.S. § 9721(b), a provision of the Sentencing Code. Appellant's Brief at 18; **see also Luketic**, 162 A.3d at 1160. We will thus exercise our discretion to consider Appellant's sentencing claim. **See Haynes**, 125 A.3d at 807; **Zelinski**, 573 A.2d at 574-75.

Our standard of review follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In order to establish that the sentencing court abused its discretion, the defendant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision. The rationale behind such broad discretion and the concomitantly deferential standard of

appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. To determine whether the trial court made the proper considerations during sentencing, an appellate court must, of necessity, review all of the judge's comments. As this Court has stated, the judge's statement must clearly show that he has given individualized consideration to the character of the defendant. . . . [I]t is an abuse of discretion when the nature of the criminal act is used as the sole basis for the determination of the length of sentence.

*Luketic*, 162 A.3d at 1162-63, 1165 (internal brackets, citations, and quotation marks omitted).

We will address each of Appellant's reasons for contesting his sentence in turn. First, Appellant contends that his sentence "essentially amounts to a life sentence." Appellant's Brief at 23; *see also id.* at 23-24. In *Commonwealth v. Baker*, 72 A.3d 652, 664 (Pa. Super. 2013), *appeal denied*, 86 A.3d 231 (Pa. 2014), we held that a sentence of 15-31 years' imprisonment for various drug offenses was not unreasonable, despite the fact that the defendant was seventy years old, because the sentencing court considered the defendant's personal characteristics, including his age. We held that so long as that the sentencing court was aware of the defendant's age and considered it during sentencing, a sentence that may result in the defendant spending the remainder of his life incarcerated is not an abuse of discretion. *Id.*

Here, Appellant was fifty years old at his sentencing hearing and was sentenced to 20.5-43 years' confinement. As in *Baker*, the trial court was aware of Appellant's age, because defense counsel informed it that Appellant

was fifty years old during the hearing on Appellant's post-sentence motion. Trial Ct. Op. at 9.[8] Hence, the trial court did take Appellant's age into consideration.

Next, Appellant argued that his sentence "fails to consider the issues of protection of the public, gravity of the offense as it relates to the victim and the community[.]" Appellant's Brief at 23. Appellant adds that the "[t]rial court failed to consider the relationship between the [A]ppellant and [Ms.] Woodard." Appellant's Brief at 25. The record belies these contentions, as the trial court specifically considered these factors, stating that it reflected upon "the horrible violence inflicted on the victim" and that "a lesser sentence would depreciate the seriousness of the crimes involved," *i.e.*, the gravity of the offense. Trial Ct. Op. at 9 (quoting N.T. Sentencing at 7); *see also* Appellant's Brief at 23.[9]

As for Appellant's related assertion that "[Ms.] Woodard suffered no physical injury as a result of the offenses," Appellant's Brief at 25, we agree with the trial court's observation that Appellant has "sought to minimize the

_____

[8] In *Baker*, the defendant potentially would have been released when he was 85 years old upon completing his minimum sentence. Here, Appellant will be just over 70 years old (the same age as the *Baker* defendant at the time of his sentencing) upon completing his minimum sentence.

[9] Appellant's argument that the trial court failed to consider "the relationship between the [A]ppellant and [Ms.] Woodward" is that: "This was not the act of a serial rapist; this was an incident between two people who had dated for almost a year." Appellant's Brief at 25. It is not entirely clear what Appellant is suggesting by this argument, but we discern no ground to conclude that Appellant's rape of Ms. Woodward at gunpoint following their earlier dating relationship should in any way be deemed mitigating.

degree of physical violence employed by [him] during the assault." Trial Ct. Op. at 9. Ms. Woodard was raped at gunpoint and also suffered facial bruising, *id.* at 3, therefore belying Appellant's claim that she "suffered no physical injury." Appellant's Brief at 25.

Appellant further maintains that the trial court did not consider his rehabilitative needs. Appellant's Brief at 15, 23-26. But Appellant fails to explain what these rehabilitative needs are, and, thus, we conclude he has not established entitlement to relief on this point.

For all of these reasons, we conclude that all of Appellant's issues on appeal are meritless.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/2/2017

COMMONWEALTH

V.

ROBERT JACKSON

: IN THE COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY, PENNSYLVANIA
:
:
:
:
: CP-21-CR-3688-2014

## OPINION PURSUANT TO PENNSYLVANIA RULE OF APPELLATE

## PROCEDURE 1925

**Masland, J., October 6, 2016:--**

The Defendant, Robert Emanuel Jackson, Jr., following his convictions and

judgment of sentence for the offenses of Rape, Involuntary Deviate Sexual Intercourse,

Burglary, Sexual Assault, Aggravated Assault, Criminal Trespass, Unlawful Restraint,

Terroristic Threats, Simple Assault, and Person Not to Possess a Firearm, complains of

the following matters on appeal:

> 1.  The trial court erred by denying [Defendant's] pre-trial
> motion to exclude the recorded phone conversation between
> [Defendant] and the victim.
> 2.  The trial court erred by denying [Defendant's] pre-trial
> motion to exclude the contents of [Defendant's] diary seized
> by the Commonwealth.
> 3.  The trial court abused its discretion when it sentenced
> [Defendant] disproportionately to the crimes for which he
> was convicted.
> 4.  The trial court erred when it denied [Defendant's] post
> sentence motion based on the Jury's verdict being against
> the weight of the evidence.
> 5.  The trial court erred by denying [Defendant's] motion for
> judgment of acquittal pertaining to the sufficiency of the
> evidence for the aggravated assault – causing bodily injury
> with a deadly weapon count.

Statement of Matters Complained of on Appeal, filed August 19, 2016.



62



## I. Facts

In December 2013, the victim, J.W., began a romantic relationship with the Defendant, Robert Jackson, whom she had met online. In September 2014, she unilaterally ended the relationship. Despite the end of the relationship, the Defendant would not stop contacting the victim by phone and social media forcing her to block him electronically on all platforms. All this notwithstanding, on October 21, the Defendant showed up at the victim's house unannounced and uninvited, pushed his way in and pressured the victim into a discussion about their relationship. Ultimately, she convinced him to leave, which he did without harming her, though he was extremely angry she had not permitted him to stay overnight.

Ten days later, on Halloween night, the victim was alone in her home getting ready to go out with friends. There was a knock at her door and, again, it was Defendant arriving uninvited. She told him to leave and refused to allow him inside. However, Defendant begged and pleaded that he only wanted to speak to her for five minutes. Eventually, the victim opened the door and the Defendant entered with a gun drawn which he put to her head. She screamed and he pushed her inside the house. He struck her in the face with his hand knocking her to the floor. With the gun held to her head, he said, "I'm going to kill you, bitch, and I'm going to kill myself." Notes of Testimony, December 14, 15, 16, and 17 at 66 (hereafter N.T. at __). The Defendant then grabbed the victim by her hair and pulled her across the floor into her bedroom while she begged for her life.

Once in the bedroom, the Defendant closed the door and pointed the gun at the victim. As he forced the victim to take her clothes off, he taunted her by tracing the

point from the laser scope of the gun over various parts of her body. He demanded she perform oral sex on him and threatened that if she failed to comply her children would never see her again. During these threats the Defendant removed the jacket he was wearing but kept his clothes on while he had his penis out and was masturbating. The Defendant began counting out loud threatening that if the victim did not comply with his demands by the time he reached 10 he would kill her. In fear for her life and against her will, the victim complied, and performed oral sex on the Defendant. During the entire time she was being forced to have the Defendant's penis in her mouth, he had the gun pressed against her head.

After a period of time, the Defendant forced the victim onto her bed and penetrated her vaginally. He was not wearing a condom and ejaculated almost immediately. He then attempted to penetrate her anally but, in pain, she screamed and jumped away. At that moment, the Defendant's demeanor suddenly changed. With seeming remorse, he said he couldn't believe he hit her and raped and that he could not go to jail. Still in fear for her life, as the Defendant remained armed, the victim told him that she would never tell anyone what happened and tried to convince him to consider his love for his children and just to leave peacefully.

In an apparent attempt to explain his actions and state of mind, the Defendant then forced the victim to read out loud entries from his personal journal that were stored on his cellular phone. After, the victim finished reading the journal entries the Defendant professed his love for her repeatedly and then left. As a result of attack, the victim suffered facial bruising and fear for her life and safety and the safety of her children.

-3-

In extreme distress and afraid the Defendant may return, the victim's first concern was for her two children who were out with friends. She left to pick up her children and took them to the home of a close friend. On the ride over, she called 911 to report the attack. After leaving her children with her friend, the victim proceeded to the East Pennsboro Police Department. The court notes that at trial defense counsel attacked some of the victim's recollection of the precise series of events that would follow. Regardless, she credibly testified that in the ensuing hours she made a statement to police, had a rape kit examination performed on her at Harrisburg Hospital, and then later went with an officer to inspect her house,

Shortly thereafter, under the supervision of police, the victim made a recorded phone call to the Defendant where she confronted him about the attack. During the call he was apologetic and made several statements that could be construed as admissions. Police also discovered Defendant's coat at the scene of the crime. Further investigation revealed an iPad belonging to the Defendant that contained a file entitled "Journal" that contained statements similar to those included in the digital journal the victim was forced to read on the night of the attack. Police also discovered a handgun with a laser scope matching the one used in the attack in the Defendant's home in West Virginia. Cell phone tower location records for the Defendant's phone also corroborated the victim's timeline of events and confirmed the Defendant's presence in the vicinity of the victim's home at the time of the attack. Finally, the rape kit examination and DNA analysis resulted in a match for the Defendant's semen.

Based on these facts, the Defendant was arrested and charged with numerous sexual offenses. Following a jury trial, he was convicted of the majority of those

-4-

offenses and was sentenced to an aggregate sentence of 20.5 to 43 years in a State Correctional Facility.

## II. Discussion

### A. Phone Conversation

The Defendant argues the court erred by denying his pre-trial motion to exclude the recorded phone conversation between himself and the victim on the basis that it constituted impermissible hearsay.

"The admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Mitchell*, 902 A.2d 430, 452 (Pa. 2006). Even if a trial court makes an erroneous evidentiary ruling, that mistake will not justify a new trial if it constitutes harmless error. Harmless error exists where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002).

Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Pa.R.E. 801(c). Generally, hearsay testimony is inadmissible at trial. Pa.R.E. 802. However, Rule 803 provides several exceptions to the hearsay rule, relevant here:

> Rule 803. Exceptions to the Rule Against Hearsay— Regardless of Whether the Declarant Is Available as a Witness

-5-

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
* * *

(25) An Opposing Party's Statement. The statement is offered against an opposing party and:
(A) was made by the party in an individual or representative capacity[.]

Pa.R.E. 803(25)(E).[1]

During the taped conversation, the Defendant made numerous statements that can be characterized as admissions. When confronted by the victim, the Defendant said, "I never meant to hurt you. I'll write you a letter and explain everything to you." N.T. at 7. These comments, considered in the context of the victim confronting the Defendant the day after his brutal attack upon her constitute sufficient admissions to permit them to be offered against the Defendant. This court did not err in admitting the recording of the telephone call.

## B. Diary

Next, the Defendant argues the court erred in allowing the contents of his diary to be admitted into evidence on the grounds that it is hearsay and contains no admissions that would make it otherwise admissible. The Commonwealth argued that it was admissible to show the Defendant's present state of mind. As previously recited there are several exceptions to the hearsay doctrine. The Rules provide for the admissibility of "[a] statement of the declarant's then-existing state of mind (such as motive, intent or

---

[1] The Explanatory Comment to Rule 803(25)(E) provides:

The statements in this exception were traditionally, and in prior versions of both the Federal Rules of Evidence and the Pennsylvania Rules of Evidence, called admissions, although in many cases the statements were not admissions as that term is employed in common usage. The new phrase used in the federal rules--an opposing party's statement--more accurately describes these statements and is adopted here.

Pa.R.E(803)(25)(E) (Explanatory Comment).

-6-

plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) .... Pa.R.E. 803(3).

Here, the diary included an entry written just before the assault occurred addressed to the victim describing how the Defendant missed the victim and wanted to get back together with her. It also included an ominous ending: "Journal complete. Outcome unknown." N.T. at 10. Obsessive diary entries addressed to the victim written hours before she was attacked by the Defendant are clearly relevant to establishing his state of mind and motive on the night of the crime. Accordingly, the evidence was both admissible and relevant.

## C. Weight of the Evidence

The Defendant contends that the court erred when it denied his post-sentence motion based on the jury's verdicts being against the weight of the evidence. Our Superior Court has stated:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. Our Supreme Court has explained that appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. A new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Stated another way, ... this Court has explained that the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Sullivan*, 820 A.2d 795, 805-06 (Pa. Super. 2003) (citations and internal quotation marks omitted).

At the hearing on the Defendant's Post-sentence Motion, his counsel argued that the jury's verdict was against the weight of the evidence because even though the alleged attack occurred on Halloween night in a crowded residential neighborhood, a police canvass of the area revealed no witnesses who heard the attack. He also argued that despite the victim's account of the attack, there were no visible extreme physical injuries on her body to substantiate her claims.

These allegations are insufficient to shock the court's conscience and compel us to order a new trial. First, whether people who may have been outside of the victim's home heard the attack is really not relevant. Next, the Defendant raped the victim at gunpoint thereby using the weapon to force her compliance which would help explain the lack of extreme physical injuries. Also, as noted by the nurse's testimony at trial, lack of evidence of physical trauma is not necessarily evidence that a rape did not occur. Finally, here was DNA evidence showing the Defendant had had intercourse with the victim and his coat was left at the scene of the crime. Based on these facts and all the evidence introduced at trial the court is well-satisfied that the jury's verdicts are not against the weight of the evidence.

### D. Disproportionate Sentence

The Defendant complains that the court erred by sentencing his disproportionately to the crime for which he was convicted. Following the Defendant's convictions, the court sentenced him to an aggregate sentence of not less than 20 and one half years to not more than 43 years. At the hearing on the Defendant's post-

-8-

sentence motion, his counsel argued that this court's judgment of sentence was too harsh as it ignored the protective needs of the community as the Defendant only had one victim rather than several. Counsel also noted that as the Defendant was 50 years old, such a sentence would amount to a life sentence. Counsel also sought to minimize the degree of physical violence employed by the Defendant during the assault.

As the Commonwealth noted, the sentence imposed is a standard range sentence and in light of the horrible violence inflicted on the victim, it was wholly appropriate. This court agreed and stated, "a lesser sentence would depreciate the seriousness of the crimes involved." In re Transcript of Proceedings Motion to Modify Sentence, May 23, 2016 at 7. The court submits that this standard range sentence is not disproportionate to the Defendant's crimes.

### E. Sufficiency of the Evidence - Aggravated Assault (Causing Bodily Injury with a Deadly Weapon)

The Defendant argues the court erred by denying his motion for judgment of acquittal pertaining to the sufficiency of the evidence for the aggravated assault – causing bodily injury with a deadly weapon count.

"The standard of reviewing the sufficiency of the evidence is whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all the elements of the offense beyond a reasonable doubt." *Commonwealth v. Strouse*, 909 A.2d 368, 368-69 (Pa. Super. 2006). "The Commonwealth need not preclude every possibility of innocence or establish the defendant's guilt to a mathematical certainty." *Commonwealth v. Brotherson*, 888 A.2d 901, 904 (Pa. Super.

2005). "The finder of fact—here, the jury—exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence." *Commonwealth v. Sanchez*, 36 A.3d 24, 39 (Pa. 2011) (internal citations omitted).

To establish aggravated assault – causing bodily injury with a deadly weapon, the Commonwealth must prove the Defendant "attempt[ed] to cause or intentionally or knowingly cause[d] bodily injury to another with a deadly weapon ..." 18 Pa.C.S. § 2702(a)(4). Bodily injury is defined as an "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. §2301. The statutory definition of deadly weapon includes, "[a]ny firearm, whether loaded or unloaded ...." *Id.*

First, this issue is waived. At the close of the case, the Defendant moved for acquittal on this count, which the court denied, noting at the time that this could present an issue to be handled post trial. However, in his post-sentence motion, the Defendant failed to raise this issue in any way, thus depriving the court the opportunity to reevaluate its previous decision. The Defendant cannot now revive his objection by raising it in his concise statement of matter complained of on appeal. Further, even if the court were to reach this issue on the merits, the victim credibly testified that during the assault the Defendant forcefully pressed the gun against her head and that she suffered bruising on her face; though it is not totally clear what contact caused the bruising, some harm occurred. On these facts and allowing full deference to the jury's role as fact-finder, the jury's verdict of guilty for aggravated assault – cause bodily injury with a deadly weapon is supported by substantial evidence.

-10-

## III. Conclusion

For all these reasons, this jury's verdicts of guilty and this court's judgment of sentence should be affirmed in all respects.

By the Court,

Albert H. Masland, J.

Charles J. Volkert, Jr., Esquire
For the Commonwealth

Eric Delp, Esquire
For Defendant

OCT 0 6 2016
Copies mailed on_____

Copies delivered on _____ OCT 0 6 2016

-11-